Filed 8/12/14  P. v. Cruz CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B249039 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. VA118152) |
| OMAR CRUZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michael A. Cowell, Judge.  Affirmed.

Peter Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an information filed by the Los Angeles District Attorney, defendant and appellant Omar Cruz was charged with murder. (Pen. Code, § 187, subd. (a))[1] It was alleged that appellant personally used a firearm within the meaning of section 12022.53, subdivisions (b), (c), and (d). It was also alleged that the offense was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C).

Appellant pleaded not guilty and denied the allegations. Trial was by jury. The jury found appellant guilty of second degree murder and found the firearm enhancement to be true. It found the gang enhancement to be not true.

The trial court denied probation and sentenced appellant to 40 years to life in prison. He was awarded credit for days of actual custody. And, he was ordered to pay various fines.

Appellant timely filed a notice of appeal. On appeal, he argues that the trial court abused its discretion and violated his constitutional right to a fair trial when it allowed the prosecution to introduce gang-related evidence.

We affirm.

## FACTUAL BACKGROUND

I. *Prosecution Evidence*

In December 2010, Carolina Torres (Torres) had been dating appellant for around two to three months. He did not tell her that he belonged to a gang, but she assumed that he did because of his "Lott" tattoos. Torres had seen appellant carry a gun in his waistband two or three times, but she never asked him about the gun.

On December 24, 2010, Torres picked up appellant at his apartment complex on Carmelita Avenue in Huntington Park. They left to get some food and then returned to the parking lot of the apartment complex and ate in the car. A man approached the car and asked if appellant wanted a beer. Appellant said that he did, but to give him a

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

minute.  The man walked towards a dumpster in the parking lot.  When they finished their meal, appellant left to throw away the trash.  Appellant left Torres in the car while he joined a group of men near the entrance to the apartment complex.  Torres distracted herself with music and her phone.

Appellant returned to Torres with a beer in his hand and said that he would not be long.  Appellant also said that an enemy from "East Los" was there.  When appellant returned to check on Torres a second time, she said that she was cold.  Appellant got her a blanket from his apartment.  Then he returned to the group of men drinking beer.

Juan Arnaldo Villalva Lopez (Villalva) lived in the same apartment complex.  He was drinking beer with a group of about five men when appellant approached.  Villalva had seen appellant around the complex many times, but only knew him by sight.

Villalva noticed that there was some tension between appellant and another man in the group (Jesus Cardenas Salas (Salas)) who Villalva did not know.  At one point, appellant said that he "had something" and patted his waistband.  Villalva did not see a gun.  Villalva did not hear any talk regarding gangs and did not know if any gang claimed the area where he lived.

When appellant returned to Torres a third time, she was frustrated and said that she wanted to leave.  Appellant got in the car and Torres started to drive to an area they called "the U."  It was a nearby street where they had more privacy and regularly had sex in the car.

Appellant told Torres to stop the car.  He got out and said that he was going back to his apartment because he had forgotten something.  He told her to wait for him.

Villalva was still near the entrance of the apartment complex when he heard gunshots coming from Carmelita Avenue.  Villalva went inside his apartment.  He later identified appellant from a photographic line up as being part of the group drinking beer.

Appellant returned to Torres around 10 to 15 minutes later and said, "'Hurry up. Let's go.'"  They drove to "the U," had sex, and spent the night in the car.  They drove to Torres's house at around 8:00 a.m. and cleaned up.

3

Huntington Park Police Officer Cliff Lohner responded to the scene at around 4:00 a.m. He noticed broken glass on the ground next to a vehicle, in a pool of reddish liquid, along with some shell casings. A man in the driver's seat had multiple gunshot wounds to the face and chest.

Dr. David Whiteman, a forensic pathologist, performed the autopsy on Salas. Salas died from multiple gunshot wounds to the head and chest. Dr. Whiteman discussed nine separate gunshot wounds, two of which had "stippling," which indicated that the gun was fired at close range. He collected four bullets from Salas's body. Salas did not have any tattoos.

Huntington Park Police Officer Gabriel Alpizar investigated the case. He interviewed Villalva at the police station a few hours after the shooting. Villalva said that he had been drinking beer in the parking lot with a group of men, including appellant. Villalva said that appellant and another man seemed to have "some tension" even though Villalva did not hear any aggressive conversation. At one point, appellant lifted his shirt to show his waistband and said something to the effect that he had "this" in case he needed to take care of business. Villalva did not see a gun. Someone asked to touch the gun, but appellant said that he did not allow people to touch it.

Officer Alpizar interviewed Torres three days after the shooting. Torres said that she and appellant entered her residence at around 9:30 a.m. on the morning of the shooting. She saw appellant "opening the gun" and place it between the mattresses in the bedroom.

Huntington Park Police Officer Steve Thoreson participated in the interview of Torres. Torres said that appellant sometimes hid his gun at her residence. She let the officers search her bedroom. Officer Thoreson discovered appellant's gun in Torres's bedroom, wrapped in a plastic bag, under a dresser drawer.

Appellant called the police station later that day and went in to be interviewed. After he was arrested, appellant managed to get loose from the handcuffs and escape. Appellant was rearrested on January 7, 2011; he was found in the trunk of a vehicle parked at the police impound lot.

4

Appellant's fingerprints were found on the plastic bag wrapped around the gun. DNA found on the handgun was consistent with appellant's DNA profile. Los Angeles Deputy Sheriff Ivan Chavez, a firearms expert, identified appellant's gun as a Heckler and Koch semi-automatic. Bullets recovered by the coroner and bullets recovered from the victim's vehicle were fired from appellant's gun, though a few of the bullets were too badly damaged for comparison. Eight casings found at the scene were fired from appellant's gun. Appellant's ammunition magazine had a nine-round capacity.

Los Angeles County Sheriff Deputy Eduardo Aguirre testified as a gang expert. He was familiar with appellant's gang, "The Lott" or "Lott 13." The gang had around 150 members spread among three cliques. Appellant was an admitted Lott gang member. The shooting occurred in a neighborhood claimed by the Lott gang. It is common for gang members to shoot at perceived rivals. Deputy Aguirre would expect a confrontation between a Lott gang member and a member of East Los Angeles, a rival gang. When given a hypothetical consistent with the evidence presented at trial, Deputy Aguirre opined that the shooting was committed for the benefit of appellant's gang. Deputy Aguirre stated that gang crimes intimidate people living in the neighborhood and dissuades them from reporting crimes to the police. Gang members gain respect by committing violent crime in the name of their gang.

II. *Defense Evidence*

Appellant testified that he had belonged to the Lott gang for about three years. His gang claimed the neighborhood where he lived. He was 21 years old at the time of trial. He had been dating Torres for around three months.

On the night of the shooting, appellant was drinking beer with a group of men behind his apartment complex. He had seen Salas before and had no problems with him. While they were drinking, Salas was "being a little too friendly" with appellant, such as hugging him like they were close friends. Appellant thought that Salas's behavior was inappropriate, but he shrugged off Salas's contact. Appellant knew that Salas was "just messing with" him. Salas was whispering to another man and laughing at appellant.

5

Appellant felt disrespected. Appellant had a loaded gun in his waistband, but he did not show anyone his gun. There were no conversations pertaining to gangs that evening.

Appellant and Torres left the parking lot and were on their way to have sex in the car. Appellant told Torres to stop the car and wait. He forgot something and he was going to run back to his apartment. He intended to buy some marijuana from a neighbor.

As appellant approached the parking lot of his apartment complex, he saw Salas vomiting near a car. Salas spit in appellant's direction and appellant objected to where it landed. Salas and appellant exchanged some unpleasantries. Salas pushed appellant and appellant nearly fell down. Appellant was angry and approached Salas as he was getting into his car. Appellant pulled out his gun and banged on the car window, which shattered. Salas grabbed for appellant's gun and they struggled to gain control. Salas was much bigger than appellant and when it appeared that Salas was stripping away the gun, appellant pulled the trigger and emptied the magazine clip into Salas. According to appellant, he closed his eyes or "kind of like blanked out."

Appellant ran back to Torres's car, but did not tell her what happened. They drove to their private spot and had sex.

## DISCUSSION

Appellant argues that the trial court abused its discretion in admitting evidence of his gang involvement.

A. <u>Relevant Proceedings</u>

During trial, outside the presence of the jury, the trial court expressed concern about the gang enhancement allegation because the evidence, so far, indicated that the victim was not a gang member. The prosecution argued that the evidence showed that appellant told Torres that one of his enemies from "East Los" was at the gathering and later, when appellant and Torres were driving away, appellant asked her to stop the car and he ran back to the apartment complex, where he shot and killed Salas. The trial court stated, "I'm not indicating a ruling. I'm expressing my concern on this one issue." Thereafter, Deputy Aguirre testified as an expert on the Lott 13 gang, including their cliques, primary activities, and other elements in support of the gang enhancement

6

allegation under section 186.22, subdivision (b). Deputy Aguirre also testified that two Lott gang members had been convicted of crimes and were in prison.

At the close of the People's case, defense counsel argued that the evidence was insufficient to support the gang enhancement. The prosecutor argued that appellant told his girlfriend that an enemy from East Los was in the group. Further, Villalva testified that appellant and Salas appeared to have some tension between them and appellant, at one point, started talking about the gun in his possession and raised his shirt to expose his waistband. Additionally, appellant lived in an area claimed by his Lott 13 gang. Later that same day, appellant shot and killed Salas. In sum, there was not "an absence of evidence" that the shooting was gang-related. The trial court stated that the gang enhancement was "the weakest part of the People's case," but it was not enough to take the issue away from the jury. Ultimately, the jury found the gang enhancement not to be true.

Appellant filed a motion for a new trial, arguing that the gang evidence was prejudicial and, without it, a jury "would very likely reach a different verdict." The prosecutor pointed out that appellant admitted that he was carrying a loaded gun at the time, that he confronted the victim, "and couldn't provide an explanation as far as how the victim received the number of gunshot wounds that he did receive." The trial court ruled as follows: "I do agree that the jury was not unduly influenced, not only because they found the gang allegation to be untrue, despite the People's contention this was a murder committed for that purpose, but they also found this to be a second degree murder. In other words, they may have given some credence to the defendant's story of a confrontation at the scene of the car, notwithstanding the fact that he got out and went back to the scene. But they did not find this was willful, deliberate, and premeditated. And I think the jury assimilated and evaluated the evidence in a fair and legitimate manner. [¶] I see there is no basis to grant the motion for a new trial. I think the gang evidence was properly admitted. And I find that there's no insufficiency in the evidence to require that the verdict be set aside."

B.  Standard of Review

"A trial court's admission of evidence, including gang testimony, is reviewed for abuse of discretion.  [Citations.]  The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice." (*People v. Avitia* (2005) 127 Cal.App.4th 185, 193; *People v. Memory* (2010) 182 Cal.App.4th 835, 858; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.)  Even when an abuse of discretion is found, "[t]he erroneous admission of gang or other evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded." (*People v. Avitia*, *supra*, 127 Cal.App.4th at p. 194.)  It is appellant's burden on appeal to establish an abuse of discretion and prejudice. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 275.)

C.  No Error

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)  Evidence is relevant if it tends logically, naturally, and by reasonable inference to establish material facts, including intent and motive. (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)  The definition of relevant evidence is "manifestly broad." (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843.)

Gang evidence, including evidence about a defendant's gang membership, is generally admissible if it is relevant to a material issue in the case other than criminal disposition, is not more prejudicial than probative, and is not cumulative. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167; *People v. Albarran* (2007) 149 Cal.App.4th 214, 223 (*Albarran*).)  "Evidence of the defendant's gang affiliation— including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)  Gang evidence is not admissible if introduced "only to 'show a defendant's criminal

8

disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]' [Citations.] In cases not involving a section 186.22 gang enhancement, it has been recognized that 'evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.]' [Citation.] Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, 'trial courts should carefully scrutinize such evidence before admitting it.'" (*People v. Avitia*, *supra*, 127 Cal.App.4th at pp. 192–193.)

Here, the trial court did not abuse its discretion in admitting the gang evidence. The evidence was important to support the gang enhancement allegation. It was also relevant to the motive and intent of the shooter. After all, appellant was carrying a loaded gun when he joined the group of men. He returned to the group, instead of leaving, after telling Torres that an enemy from East Los was there.[2] Appellant later returned to the area and shot the victim to death. From this evidence, the jury could have permissibly inferred that the shooting was for the benefit of his gang.

Appellant's reliance upon *Albarran* is misplaced. In that case, the defendant was convicted of attempted murder, shooting at an inhabited dwelling (the home of Michael Bacelis (Bacelis)), and attempted kidnapping for carjacking. (*Albarran*, *supra*, 149 Cal.App.4th at pp. 217–218.) The prosecution's gang expert testified that the defendant's gang committed a number of criminal offenses, including robberies, drive-by shootings,

---

[2] Appellant argues that Torres's testimony is unreliable because she only revealed appellant's statement that he had seen an enemy from "East Los" after she learned that appellant had been cheating on her with another woman. This issue of credibility was for the jury to decide. (*People v. French* (1978) 77 Cal.App.3d 511, 523 [the appellate court does not reassess credibility of witnesses].) The trial court weighs the evidence and determines issues of credibility and these determinations and assessments are binding and conclusive on the appellate court. (*In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 160.)

9

carjackings and vandalism. (*Id.* at p. 221.) The gang expert added that gang members gain respect by committing crimes and intimidating people. (*Ibid.*)

The *Albarran* court held that the prosecution presented insufficient evidence to prove that the purpose of the charged crimes was to gain respect among gang members. (*Albarran*, *supra*, 149 Cal.App.4th at p. 227.) The court reasoned: "[T]he motive for the underlying crimes, in particular the shooting at Bacelis's house, was not apparent from the circumstances of the crime" because the shooting occurred at a private birthday party for Bacelis's cousin, Bacelis's gang did not have any known or relevant gang rivalries, and, although the prosecution's gang expert testified that a gang member gains respect if his identity—or the identity of his gang—becomes known to the victims within the gang community and the neighborhood, there was no evidence that the victim in that case knew the identity of the defendant or his gang. (*Ibid.*) In other words, there was "nothing inherent in the facts of the shooting to suggest any specific gang motive." (*Ibid.*)

Here, in contrast, as set forth above, the challenged evidence had legitimate purposes at trial.

Moreover, the evidence of appellant's affiliation with the Lott gang was not disproportionately inflammatory, particularly when compared to the murder. (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 343–344.) Appellant shot Salas, at close range, until his gun was empty. The gang testimony did not include any evidence that could have exacerbated the incendiary impact of the evidence of the shooting. (*People v. Scott* (2011) 52 Cal.4th 452, 491.)

Even if the trial court erred in admitting the gang evidence, that error was harmless. It is undisputed that appellant shot and killed Salas. By finding appellant guilty of second degree murder and finding the gang enhancement untrue, the verdict shows that the jury logically evaluated the evidence and was not prejudiced against appellant by the gang evidence. Thus, it is not reasonably probable that a result more favorable to appellant would have been reached in the absence of the challenged evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

10

We likewise reject appellant's claim that the trial court's admission of the gang evidence violated both his state and federal rights to due process. As discussed above, it is undisputed that appellant shot and killed the victim. The jury found that the murder was not premeditated and found the gang enhancement untrue. Thus, there is no indication that the evidence was used for an improper purpose and/or rendered the trial fundamentally unfair. (*Albarran*, *supra*, 149 Cal.App.4th at p. 232; *People v. Garcia*, *supra*, 168 Cal.App.4th at p. 275.)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, Acting P. J.
                ASHMANN-GERST


We concur:


_____, J.
        CHAVEZ


_____, J.*
        FERNS

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11